UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
DANIEL MATHISON,

                Petitioner,

-against-

DAVID A. ROCK,
Superintendent,
Great Meadow Correctional Facility,

                Respondent.
------------------------------------------------------------x

**MEMORANDUM and ORDER**

08-CV-98 (SLT)

**TOWNES, United States District Judge:**[1]

On January 27, 2003, *pro se* petitioner Daniel Mathison ("Petitioner") was convicted in the Supreme Court of the State of New York, Kings County, of assault in the first degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the fourth degree in connection with the September 23, 2001, shooting of Dyshawn Lawrence and the attempted shooting of Monique Perry. He now petitions this Court for a writ of habeas corpus under 28 U.S.C. § 2254. For the reasons set forth below, the petition is denied.

**I.    BACKGROUND**

On September 23, 2001, Dyshawn Lawrence suffered a gunshot wound to the abdomen during an incident outside a building in East New York, Brooklyn. His sister, Monique Perry, was also fired upon, but escaped unscathed. In addition to Lawrence and Perry, Fatima Brown and Petitioner's sister were eyewitnesses to the incident. Lawrence, Perry, Brown, Petitioner, and Petitioner's sister all lived in the same neighborhood in East New York, Brooklyn, and were socially acquainted prior to September 23, 2001.

---

[1] The Court gratefully acknowledges the assistance of a student intern, Robert Sobelman of Brooklyn Law School, in the preparation of this Memorandum and Order.

The shooting occurred around 7:30 p.m., after an altercation developed between Lawrence, Perry, and Petitioner. Lawrence attempted to hit Petitioner with his fist. In reaction, Petitioner pulled out a gun, which he had earlier displayed to Perry, and shot Lawrence in the abdomen. Petitioner fired multiple shots at Perry as well, but she was not injured. Petitioner then fled to a nearby apartment of a friend. Petitioner was arrested in that apartment approximately one hour after the shooting. When he was apprehended, the gun that was used in the shooting was recovered by the police.

Petitioner was charged by Kings County Indictment Number 7564/01 with attempted murder in the second degree, assault in the first degree, attempted assault in the second degree, and other offenses. In January 2003, his case was assigned to Justice Michael Brennan of the Supreme Court of the State of New York, Kings County, for hearing and trial.

### A. The *Molineux* Application

On January 14, 2003, at a pre-trial hearing before Justice Brennan, the prosecutor stated that both Brown and Perry had been contacted several times by Petitioner and by one of Petitioner's investigators (H. 48-49, 52-53).[2] The prosecutor stated that Brown was intimidated, that she was no longer willing to testify at trial (H. 48-49), and that Perry was reluctant to testify as well (H. 53). The prosecutor further reported that Petitioner had approached Lawrence while both were in custody, and that Lawrence, too, was reluctant to testify (H. 53). Although the prosecutor did not request any specific relief, Justice Brennan reserved judgment on the admissibility of the allegations of contact with the witnesses by Petitioner (H. 51, 55).

---

[2] Numbers in parentheses preceded by "H." denote pages in the transcript of the pre-trial hearing.

2

When the parties appeared before Justice Brennan for jury selection the following day, the prosecutor revisited the issue of Petitioner's contacts with Brown saying:

> I know your Honor hasn't ruled on the issues we presented yesterday. We do know that the defendant did make phone calls to Fatima Brown in this case, at least 15 phone calls. . . . [I]t's along the lines of Molineux to bring that out as part of her testimony, in her part of her reluctance to testify in this case. She's going to take the stand and be somewhat reluctant.

(J.S. 6).[3] Although the prosecutor made no specific request, Justice Brennan again deferred his decision (J.S. 7).

On January 21, 2003, before jury selection was complete, the prosecutor again raised the issue of Petitioner's alleged contacts with Brown (J.S. 224). The prosecutor reiterated that he wanted to be "allowed to bring out" one of the allegedly intimidating phone calls that Petitioner made to Brown pursuant to *People v. Molineux*, 168 N.Y. 264 (1901) (J.S. 224). The prosecutor did not indicate what he intended to show through the introduction of such evidence, but stated:

> It's a crime, Judge, it's a prior bad act. It's an act on the part of this defendant. It's a crime. It's an uncharged crime. It's a crime in which he could be ultimately indicted of, but right now it's an uncharged crime that was committed by this defendant while he was incarcerated, against one of the witnesses in this case.

(J.S. 224). Justice Brennan clarified that there was no order of protection in effect at the time Petitioner contacted Brown (J.S. 224-25), and, once again, reserved his decision on the prosecutor's *Molineux* application (J.S. 226).

On January 21, 2003, just before Petitioner's trial was set to commence, Justice Brennan ruled on the prosecutor's *Molineux* application (Tr. 3).[4] He stated:

---

[3] Numbers in parentheses preceded by "J.S." denote pages in the transcript of the jury selection proceedings.

[4] Numbers in parentheses preceded by "Tr." denote pages in the transcript of the trial.

3

> What [the prosecutor] presented to the Court is not Molineaux [sic] and prior bad acts are not under the Molineaux standard. Doesn't meet any of the exceptions under Molineaux. The fact that the calls were made is not in itself probative under Molineaux so [the prosecutor's] application is denied.

(Tr. 3).

### B. Trial

At the trial that commenced later on January 21, 2003, the prosecution called nine witnesses, three of whom - Lawrence, Brown, and Perry - had observed the shooting. On direct examination, Lawrence testified that on September 23, 2001, he and Perry were in the midst of an altercation with Petitioner when he tried to hit Petitioner with his fist (Tr. 50, 55-56). Although Lawrence claimed not to "know" who shot him, he testified that after attempting to hit Petitioner, he suddenly saw a gun "spark" right in front of him, where Petitioner was standing, and was shot in the abdomen (Tr. 58-59, 76).

At one point during Lawrence's testimony, the prosecutor attempted to question him about conversations that he had with his sister, Perry, while incarcerated on a drug offense (Tr. 69). The prosecutor first asked if Perry told him what the "word on the street was" regarding Petitioner's case (Tr. 69). Defense counsel promptly objected and that objection was sustained (Tr. 69-70). The prosecutor then asked if Perry told him that "people were threatening her" (Tr. 70). Defense counsel again objected (Tr. 70). This time, Justice Brennan not only sustained the objection but specifically instructed the jury to disregard the question (Tr. 70).

On January 22, 2003, prior to the second day of testimony, the prosecutor again raised with the court the issue of the phone calls that Brown received from the defendant (Tr. 129). The prosecutor stated that Brown "actually spoke to the defendant on one occasion" and that the

conversation included a discussion of her testimony before the grand jury in Petitioner's case (Tr. 129-30). The prosecutor requested that he be allowed to "bring that out" during his direct examination of Brown (Tr. 130). Defense counsel did not make an objection to the request. Although this application was similar to the *Molineux* application which Justice Brennan had denied on the previous day, Justice Brennan did not refer to that ruling. Rather, he addressed only the hearsay aspects, stating that the prosecutor could ask about the conversation as long as "it's in the nature of an admission by the defendant" (Tr. 130). However, he also noted that he would rule on the questions as they were asked (Tr. 130).

Later on January 22, 2003, Brown was called to testify by the prosecutor (Tr. 130). On direct examination, Brown testified that on the evening of September 23, 2001, she was walking toward Perry, Lawrence, Petitioner, and Petitioner's sister when she observed that they were engaged in an altercation (Tr. 136). Brown further testified that as she called out to Perry from across the street, she saw Petitioner "pull out a gun and shoot [Lawrence]" (Tr. 136).

Near the end of his direct examination, the prosecutor asked Brown whether she had spoken to Petitioner since the incident of September 23, 2001 (Tr. 154). Brown testified that Petitioner called her on the phone and that they spoke once (Tr. 154-55). Brown further testified that, during that conversation, Petitioner asked her not to testify in this case and then asked to speak to Perry (Tr. 155). When the prosecutor asked whether Petitioner mentioned Brown's grand jury testimony during that conversation (Tr. 155), Brown responded that an unknown source had sent her a copy of her grand jury testimony and that Petitioner referenced that testimony on the phone call and asked her why she testified against him (Tr. 155-56). At the close of the prosecutor's direct examination of Brown, the prosecutor asked, "Did [Petitioner] threaten you in any way?" (Tr. 157). Defense

5

counsel objected, and Justice Brennan sustained the objection and instructed the jury to "disregard the question" (Tr. 157-58). Defense counsel moved for a mistrial, which was denied (Tr. 158).

After Brown's testimony was completed, the prosecutor called Perry to testify (Tr. 180). On direct examination, Perry testified that before Lawrence joined the altercation with Petitioner, Petitioner "pulled out his gun" and threatened to shoot her "in [her] head" (Tr. 183). In addition, she testified that after Lawrence unsuccessfully attempted to hit Petitioner, Petitioner "pulled out the gun and shot [her] brother," Lawrence (Tr. 184-85). Perry further testified that, after Petitioner shot Lawrence, she ran after Petitioner with a knife, at which time Petitioner turned and shot at her as well (Tr. 185).

After the prosecution rested on January 24, 2003, the defense called Ivan Bermudez, an investigator retained by defense counsel, to testify (Tr. 386-87). On direct examination, Bermudez testified that he spoke with Brown at her residence about six months before the trial (Tr. 388). Bermudez testified that Brown told him that she was only testifying against Petitioner "to help out a friend" and that "[s]he didn't see what happened at all" (Tr. 388).

On cross-examination, the prosecutor attempted to rehabilitate Brown by eliciting testimony about other statements Brown made to Bermudez in the course of his investigation (Tr. 389-417). Bermudez testified that Brown told him that Petitioner called her several times and had harassed her (Tr. 399). While defense counsel objected to the prosecutor's questions regarding the report, there is no indication as to the specific grounds for the objection (Tr. 398-99). The objection was overruled (Tr. 399).

In his summation on January 27, 2003, defense counsel emphasized that "the witnesses . . . [were] not credible . . . and not reliable" (Tr. 438). In particular, defense counsel derided

Brown's testimony as "contrived" and "false," and pointed to Bermudez's testimony as evidence for that argument (Tr. 442). Specifically, defense counsel stated:

> [T]he reason we know that is because Mr. Bermudez -- obviously [Brown] is not going to admit that when I cross-examined her. My investigator who was checking on this case spoke to her last year in June and what did she tell him. She said she didn't see what happened. She did this to help a friend and that she was not going to admit it. She didn't want to get in trouble.

(Tr. 444). Later in his summation, defense counsel offered an explanation for Brown's allegedly untruthful testimony, again pointing to Bermudez's testimony, stating:

> [Brown and Bermudez] went to the side by the building and she told him essentially what happened. She didn't see what happened. She was just helping out a friend, Monique, and that's why she lied in the Grand Jury.

(Tr. 445).

In his summation, the prosecutor responded to this argument by suggesting a reason why Brown might deny knowing what happened. After briefly referencing the phone calls that Petitioner made to Brown, the prosecutor stated:

> Ask yourselves why was [Brown] was uncomfortable sitting in this courtroom and testifying. Again she's got to go back to that same neighborhood. She herself had been receiving several telephone calls from this defendant that came out through their investigator and she said to you he was asking me why am I testifying against him? She says that's directly coming from this defendant.

(Tr. 462). Toward the end of his summation, the prosecutor briefly reiterated:

> [W]hat we know is that after this [shooting] happens that that's when the ball starts to roll on the part of this defendant. Telephone calls are made; things are done. To try to stop these witnesses to come here. It's critical what happens to Fatima Brown. Why on either [sic] would he call her? I won't go further than that. Ask yourself why did he continue to harass her? Why did he do it?

7

(Tr. 481). No objection was made by defense counsel to either of these portions of the prosecutor's summation.

Later that same day, Justice Brennan charged the jury on seven offenses. Justice Brennan separated these offenses into two groups. First, he charged those offenses committed against Lawrence: attempted murder in the second degree on the theory that Petitioner intended to kill Lawrence; assault in the first degree on the theory that Petitioner intended to cause serious physical injury to Lawrence; and criminal possession of a weapon in the second degree on the theory that petitioner possessed the firearm with intent to use it unlawfully against Lawrence. Justice Brennan then instructed the jury on the offenses committed against Perry: attempted assault in the first degree on the theory that Petitioner intended to cause serious physical injury to Perry; reckless endangerment in the first degree; and criminal possession of a weapon in the second degree on the theory that petitioner possessed the firearm with intent to use it unlawfully against Perry. Finally, Judge Brennan charged the jury on the crime of criminal possession of a weapon in the fourth degree.

After less than an afternoon of deliberations, the jury returned a verdict of guilty on the charges of assault in the first degree and criminal possession of a weapon in the second degree with regard to Lawrence and on the charge of criminal possession of a weapon in the fourth degree with regard to Perry (Tr. 547-48). The jury returned a verdict of not guilty on the charge of attempted murder in the second degree with regard to Lawrence and on the charges of attempted assault in the first degree, reckless endangerment in the first degree, and criminal possession of a weapon in the second degree with regard to Perry (Tr. 547-48).

After the jury's verdict was read, Justice Brennan began to thank the jury for their service, but defense counsel interrupted and asked to "approach before this charge, . . . to put something on

the record" (Tr. 550). A bench conference was then held off the record (Tr. 550). When the bench conference ended, Justice Brennan finished thanking the jury and dismissed them (Tr. 550-51), before asking defense counsel if he "want[ed] to reserve any motions directed at this verdict until the date of sentence" (Tr. 551). Defense counsel then argued that the verdict was repugnant on the ground that it was "inconsistent for the jurors to come back with a guilty verdict for assault in the first degree and possession of a weapon on in the second degree regarding Mr. Lawrence and not guilty [regarding Perry on] essentially . . . those same accusations" (Tr. 552). In addition, defense counsel argued that "although there are two different individuals, . . . it's one continuous act, one possession with the weapon" (Tr. 552). Justice Brennan rejected this argument and found that the verdict was not repugnant because "the jury could have found intent relative to one individual and no intent relative to the other" (Tr. 552). However, Justice Brennan noted defense counsel's "exception for the record" (Tr. 552).

### C. Direct Appeal

Petitioner appealed his conviction to the Appellate Division, Second Department, arguing, *inter alia*: (1) that he was denied due process and a fair trial when the prosecutor violated the court's pre-trial ruling precluding evidence of alleged intimidation of Brown (Pet. Br. at 17),[5] and (2) that the guilty verdicts were against the weight of evidence adduced at trial (Pet. Supp. Br. at 4).[6] On June 19, 2007, the Appellate Division unanimously rejected Petitioner's claims. *People v. Mathison*, 836 N.Y.S.2d 882 (N.Y. App. Div. 2007). The Appellate Division found that the evidence was

---

[5] "Pet. Br." refers to Petitioner's brief to the Appellate Division, filed on May 19, 2006.

[6] "Pet. Supp. Br." refers to Petitioner's supplemental *pro se* brief to the Appellate Division, filed on September 19, 2006.

"legally sufficient to establish the defendant's guilt beyond a reasonable doubt" and concluded "that the verdict of guilt was not against the weight of the evidence." *Id.* at 882. Importantly, the Appellate Division also held that "[t]he defendant's remaining contentions either are without merit or do not require reversal." *Id.*

Petitioner sought leave to appeal to the New York Court of Appeals. On August 30, 2007, Associate Judge Victoria A. Graffeo summarily denied that application. *People v. Mathison*, 9 N.Y.3d 878 (2007) (Table).

### D. Collateral State Court Proceedings

On March 26, 2008, Petitioner filed a *pro se* motion in New York Supreme Court to vacate his conviction pursuant to CPL § 440.10 (Pet. Mot. at 1-2).[7] In this motion, Petitioner argued that his trial counsel provided ineffective assistance because he failed to protest the verdict as repugnant at a time before the jury was discharged (Pet. Mot. at 1). By decision and order dated June 5, 2008, Justice Brennan denied Petitioner's motion, holding that "defendant's motion lacks substance and merit" (Exhibit to Declaration of Daniel Mathison, dated Aug. 31, 2009 (Docket No. 9 at 5)). On July 31, 2009, the Appellate Division denied Petitioner's request for leave to appeal that decision. (Exhibit to Amended Petition (Docket No. 14 at 12)).

### E. Habeas Corpus Petition in Federal District Court

Petitioner timely filed the instant habeas petition on January 3, 2008. Petitioner asserted one ground for relief: that the prosecutor's questioning of Brown and Bermudez at trial regarding the alleged intimidation of Brown by Petitioner, and the prosecutor's subsequent comments regarding those questions in summation, violated his right to due process and a fair trial (Pet. at 4).[8] On

---

[7] "Pet. Mot" refers to Petitioner's motion to vacate the New York Supreme Court's judgment, filed on March 26, 2008. (Docket No. 13-1 at 2).

[8] "Pet." refers to the petition for a writ of habeas corpus filed by Petitioner with this Court on January 3, 2008. (Docket No. 1).

10

September 9, 2009, following the exhaustion of his collateral state court proceedings, Petitioner filed an Amended Petition adding a claim for ineffective assistance of trial counsel for failure to protest the jury's verdict as repugnant prior to the dismissal of the jury (Amend. Pet. at 3).[9]

## II. DISCUSSION

### A. The *Pro Se* Pleading Standard

"A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citations and quotation marks omitted). The same standard applies to *pro se* petitions for federal habeas relief. *See Chang v. United States*, 250 F.3d 79, 86 n.2 (2d Cir. 2001); *Dunn v. Sears*, 561 F. Supp. 2d 444, 451 (S.D.N.Y. 2008); *Charles v. Fischer*, 516 F. Supp. 2d 210, 215 (E.D.N.Y. 2007). Accordingly, the petition in this case must be "interpret[ed] to raise the strongest arguments that [it] suggest[s]." *Brownwell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006) (internal quotation marks and citation omitted).

### B. The Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

Under AEDPA's deferential standard, a federal court may not grant a writ of habeas corpus to a state prisoner on a claim that was adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Price v. Vincent*, 538 U.S. 634, 639-40 (2003). A federal habeas court may not issue a writ simply because it decides that the state court applied Supreme Court precedent

---

[9] "Amend. Pet." refers to the amended petition for a writ of habeas corpus filed by Petitioner with this Court on September 9, 2009. (Docket No. 14).

11

incorrectly. *Price*, 538 U.S. at 641. Instead, as the Supreme Court has stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ [only] if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also Rosario v. Ercole*, 601 F.3d 118, 126-27 (2d Cir. 2010).

### C. Petitioner's Claim of Prosecutorial Misconduct

Petitioner's first ground for habeas relief identifies two separate instances of alleged prosecutorial misconduct. First, Petitioner asserts that the prosecutor violated the trial judge's pre-trial ruling through certain questions he asked of Brown and Bermudez. Second, Petitioner argues that the prosecutor made improper comments in summation regarding the testimony elicited from Brown and Bermudez.

"[P]rosecutorial misconduct cannot give rise to a constitutional claim unless the prosecutor's acts constitute 'egregious misconduct.'" *Miranda v. Bennett*, 322 F.3d 171, 180 (2d Cir. 2003) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48 (1974)). A court must review allegations of prosecutorial misconduct "in the context of the entire trial." *Id.* at 180. Prosecutorial misconduct warrants a reversal only when the effect is "so prejudicial that . . . the trial in question [was] fundamentally unfair." *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) (citation omitted).

Petitioner claims that the prosecutor's questioning of Brown and Bermudez regarding alleged intimidation by Petitioner violated his right to due process and a fair trial. Specifically, Petitioner claims that the prosecutor's questions violated Justice Brennan's pre-trial *Molineux* ruling. However, it is not clear that the questioning about which Petitioner complains violated Justice

12

Brennan's ruling. Prior to the commencement of trial, Justice Brennan denied the prosecutor's *Molineux* application with regard to allegedly intimidating phone calls made by Petitioner to Brown. When the prosecutor renewed this application the day after that ruling, however, Justice Brennan implied that the hearsay rule was the only barrier to admissibility, and informed the prosecutor that he would rule on the questions as they were asked at trial. In light of this ruling, this Court cannot find that the prosecutor's subsequent questioning of Brown was in clear violation of Justice Brennan's *Molineux* ruling.

Even if the questioning was improper, it was not so prejudicial as to render the trial fundamentally unfair. When Brown was questioned by the prosecutor regarding contact with Petitioner, Justice Brennan sustained both of defense counsel's objections and immediately issued a curative instruction to the jury (Tr. 157-58). It is presumed that the jury understood and followed this instruction. *Roldan v. Artuz*, 78 F. Supp. 2d 260, 281 (S.D.N.Y. 2000) (citing cases). Any limited prejudice to Petitioner that may have resulted from these questions was minimized by Justice Brennan's immediate curative instruction.

The prosecutor's questioning of Bermudez with regard to Petitioner's contacts with Brown was responsive to questions asked by defense counsel on direct examination. On direct, Bermudez testified that he spoke with Brown and that she told him she was only testifying against Petitioner "to help out a friend" and that "[s]he didn't see what happened at all" (Tr. 388). However, defense counsel did not ask Bermudez about the statements Brown made to him regarding her contacts with Petitioner -- statements which might have explained her decision to disavow knowledge of the incident. Accordingly, the prosecutor questioned Bermudez about other statements that Brown made to him in order to offer a complete picture of that conversation to the jury.

13

Second, Petitioner claims that the prosecutor's comments in summation concerning the testimony about alleged intimidation by Petitioner violated his rights to due process and a fair trial. Generally, a prosecutor's comments will not form the basis for habeas relief of a state court conviction unless the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks and citation omitted). "[I]t is not enough that the prosecutor['s] remarks were undesirable or even universally condemned." *Id.* (alterations added). "Remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute 'egregious misconduct.'" *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (quoting *Donnelly*, 416 U.S. at 647).

A prosecutor's remarks, even if improper and beyond the bounds of fair advocacy, will not warrant habeas relief unless the remarks caused Petitioner substantial prejudice. *Bradley v. Meachum*, 918 F.2d 338, 343 (2d Cir. 1990). In considering this issue, a district court must evaluate the statements against the backdrop of the whole trial and should consider (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the improper statements. *See Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998). Furthermore, as long as the prosecutor's statements "were fair responses to the defense summation ... [Petitioner] cannot now complain about the issues raised and the atmosphere created by his own making through the defense summation." *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998).

In this case, defense counsel argued in summation that Brown's testimony was "contrived" and "false" based on a conversation she had with Bermudez (Tr. 442). In direct response to defense counsel's summation, the prosecutor argued that Brown was telling the truth and was only uncomfortable testifying at trial because of the phone calls that Petitioner made in an attempt to

14

"stop" Brown from testifying against him (Tr. 462, 481). These remarks were based on the evidence presented to the jury during Brown and Bermudez's testimony, and were made in response to the arguments made during defense counsel's summation. In addition, Justice Brennan instructed the jury to consider only the evidence at trial, and that "nothing the attorneys may say in their summations is evidence in this case" (Tr. 435-37), which is presumed to have been understood and followed. *Roldan*, 78 F. Supp. 2d at 281 (citing cases). Therefore, Petitioner was not denied a fair trial by the prosecutor's summation remarks on the evidence presented at trial because they did not cause substantial prejudice to Petitioner.[10]

### D. Petitioner's Claim of Ineffective Assistance of Trial Counsel

In his second ground for habeas relief, Petitioner claims that he was denied effective assistance of trial counsel because his trial lawyer failed to protest the jury's verdict as repugnant prior to the dismissal of the jury.[11] The Supreme Court held in *Strickland v. Washington*, 466 U.S. 668 (1984), that a claim of ineffective assistance of counsel has two components:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. To establish ineffectiveness, the first prong of *Strickland*, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Counsel

---

[10] Furthermore, in light of the overwhelming inculpatory evidence presented at trial, it can hardly be said that Petitioner was prejudiced by the admission of the relatively inconsequential evidence that he contacted one of the witnesses in this case and encouraged her not to testify.

[11] Petitioner's claim for ineffective assistance of trial counsel is not procedurally barred because it was raised in a collateral state court proceeding pursuant to CPL § 440.10.

is "strongly presumed" to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 689. The Second Circuit has routinely "declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised." *Tippins v. Walker*, 77 F.3d 682, 686 (2d Cir. 1996).

To establish prejudice, the second prong of *Strickland*, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In reviewing an ineffective assistance of counsel claim, "judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. In determining whether counsel's deficient performance resulted in prejudice, a crucial weight will be given to strength of the prosecution's case. *Latine v. Mann*, 25 F.3d 1162, 1167-68 (2d Cir. 1994).

Although a defendant's protest of the jury's verdict as repugnant "must be registered prior to the discharge of the jury properly to preserve the issue for review," *People v. Satloff*, 56 N.Y.2d 745, 746 (1982), it is unclear whether defense counsel failed to do so. Defense counsel did, in fact, request permission to approach the bench before the jury was discharged (Tr. 550). Although the bench conference was off the record, defense counsel immediately raised the repugnancy issue as soon as the trial court permitted him to make a record (Tr. 551-52). Justice Brennan then granted an "exception," indicating that he viewed the objection on repugnancy grounds to have been adequately preserved by trial counsel (Tr. 552).

16

Even if defense counsel failed to make the repugnancy argument before the jury was discharged, Petitioner would not have been prejudiced by the failure to preserve this argument. As Justice Brennan correctly noted in rejecting this argument, the verdicts were not repugnant.

Under New York law, the question of "[w]hether verdicts are repugnant or inconsistent ... is determined by examining the charge to see the essential elements of each count, as described by the trial court, and determining whether the jury's findings on those elements can be reconciled." *People v. Loughlin*, 76 N.Y.2d 804, 806 (1990) (citing *People v. Tucker*, 55 N.Y.2d 1, 6-7 (1981)). Accordingly, in order to analyze whether the jury's verdict was actually inconsistent, this Court must compare the elements of the crimes on which the jury convicted Petitioner to the elements of the crimes on which the jury acquitted Petitioner.

First, Petitioner was convicted of assault in the first degree under the theory that, with intent to cause serious physical injury to Lawrence, he caused such injury by means of a deadly weapon. In charging the jury on this offense, Justice Brennan identified two elements:

> One, that on or about September 23, 2001, in . . . Kings County, the defendant, Daniel Mathison, caused serious physical injury to Dyshawn Lawrence by means of a deadly weapon. And, two, that Mr. Mathison did so with intent to cause serious physical injury to Dyshawn Lawrence.

(Tr. 523).

While these elements were similar to the elements of two crimes upon which Petitioner was acquitted – namely, the attempted murder of Lawrence and the attempted assault of Perry – the elements were not identical. For example, in charging the jury on the intent element of attempted murder in the second degree, Justice Brennan instructed the jury that it had to find beyond a reasonable doubt that Petitioner intended "to cause the death of Dyshawn Lawrence" (Tr. 522), not

17

just serious physical injury. Similarly, in charging the jury on the intent element of the attempted assault charge, Justice Brennan instructed the jury that it had to find beyond a reasonable doubt that Petitioner had acted "with the intent to cause serious physical injury to Monique Perry" (Tr. 530), not Dyshawn Lawrence.

Because the intent element of these three crimes is different, the jury's verdicts can easily be reconciled. The jury could infer from the evidence that Lawrence was shot only once that Petitioner intended to seriously injure Lawrence, but did not intend to kill him. They could also infer from the fact that Perry remained uninjured that Petitioner never intended to injure her, but only to scare her away as she chased him while holding a knife. Accordingly, there was nothing inconsistent about the jury's decision to convict Petitioner of assault in the first degree with respect to Lawrence, while acquitting him of the attempted murder of Lawrence and the attempted assault of Perry.

For the same reason, the jury's decision to convict petitioner of criminal possession of a weapon in the second degree with respect to Lawrence and criminal possession of a weapon in the fourth degree was not inconsistent with the decision to acquit him of criminal possession of a weapon in the second degree with respect to Perry. In charging the jury on the latter offense, Justice Brennan distinguished it from the third count – also charging criminal possession of a weapon in the second degree – by emphasizing that one count involved Lawrence, while the other involved Perry. The trial judge listed the same four elements that he charged in Count Three:

> One, that on September 23, 2001, in Kings County, the defendant, Daniel Mathison, possessed a loaded firearm.
> Two, that Mr. Mathison did so knowingly.
> Three, that the firearm was operable.
> And, four, that Mr. Mathison possessed the loaded firearm with the intent to use it against another.

18

(Tr. 535). The judge then added, "In this case 'another,' was Monique Perry" (Tr. 535). The Court subsequently charged the jury on the elements of criminal possession of a weapon in the fourth degree, listing only the first three of these elements (Tr. 536).

Again, because the intent element of these weapon offenses is different, the jury's verdicts are easy to reconcile. The decision to convict Petitioner of one charge of criminal possession of a weapon in the second degree but not the other was not inconsistent because the jury could infer from the evidence that Petitioner possessed the weapon with intent to use it against Lawrence, but not against Perry. Moreover, since the jury was not required to find that Petitioner intended to use the weapon in order to convict Petitioner of criminal possession of a weapon in the fourth degree, the verdict of guilty on this count was not repugnant to the verdict of not guilty on the second-degree count relating to Perry.

## III. CONCLUSION

For the reasons set forth above, the instant petition for a writ of habeas corpus is denied. A certificate of appealability shall not issue because Petitioner has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). This Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

/SANDRA L. TOWNES
United States District Judge

Dated: July 12, 2011
Brooklyn, New York